ZACHARY N. MOOR, MA # 681469
HELEN Y. LI, CT # 439117
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Fax: (202) 514-0097
Phone: (202) 514-4185
Email: zachary.moor@usdoj.gov
helen.li2@usdoj.gov
*Attorneys for the United States of America*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| NORTH SLOPE BOROUGH, | ) Case No. 3:22-cv-00059-JWS |
| | ) |
| Defendant. | ) |
| | ) |
| THE STATE OF ALASKA, | ) |
| | ) |
| Non-Aligned Party | ) |
| Joined Pursuant to | ) |
| 33 U.S.C. § 1319(e) | ) |
| | ) |

## **COMPLAINT**

(This is a civil action arising under the Resource Conservation and Recovery Act, 42
U.S.C. § 6901 *et seq*., and the Clean Water Act, 33 U.S.C. § 1251 *et seq*.)

United States v. North Slope Borough
Case No.

1

## NATURE OF ACTION

1.      The United States of America ("United States"), by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the United States Environmental Protection Agency ("EPA"), files this Complaint and alleges as follows:

2.      This is a civil action brought pursuant to Section 3008(a) and (g) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6928(a) and (g), and Sections 309(b) and 311(b)(7) and (e) of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1319(b) and 1321(b)(7) and (e) against the North Slope Borough (hereinafter "NSB" or "Defendant").  Defendant is a municipality and a political subdivision of Alaska.  The United States seeks injunctive relief and the assessment of civil penalties for environmental violations relating to the storage of oil and the treatment, storage, and disposal of hazardous waste at more than 70 facilities across 10 communities within NSB, including Anaktuvuk Pass, Atqasuk, Utqiagvik, Kaktovik, Nuiqsut, Point Hope, Point Lay, Wainwright, Deadhorse, and Prudhoe Bay (collectively the "Communities").

3.      The State of Alaska is joined in this action as a nominal party under Section 309(e) of the CWA, 33 U.S.C. § 1319(e).  The United States reserves all claims that it may have against the State of Alaska under Section 309(e), 33 U.S.C. § 1319(e).

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the parties and the subject matter of this action pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a); Sections 309(b),

United States v. North Slope Borough
Case No.

311(b)(7)(E), (e), and (n) of the CWA, 33 U.S.C. §§ 1319(b) and 1321(b)(7)(E), (e), and (n); and 28 U.S.C. §§ 1331, 1345, and 1355.

5.      Venue is proper in this judicial district pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a); Sections 309(b), 311(b)(7)(E), (e), and (n) of the CWA, 33 U.S.C. §§ 1319(b) and 1321(b)(7)(E), (e), and (n); and 28 U.S.C. §§ 1391(b), 1395(a), because Defendant is located in this judicial district and the violations asserted herein occurred in this judicial district.

## AUTHORITY

6.      Authority to bring this civil action is vested in the Attorney General of the United States, pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), Section 506 of the CWA, 33 U.S.C. § 1366, 28 U.S.C. §§ 516 and 519, and Section 10(a) of Exec. Order No. 12777, 3 C.F.R., 1991 Comp., p. 351.

## NOTICE TO THE STATE

7.      Notice of the commencement of this action has been given to the State as required by Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act

8.      The CWA is designed to restore and maintain the chemical, physical, and biological integrity of the nation's waters.  33 U.S.C. § 1251(a).

United States v. North Slope Borough
Case No.

<u>Spill Prevention, Control, and Countermeasure Regulations</u>

9.      Section 311(j) of the CWA, 33 U.S.C. § 1321(j), authorizes the President to promulgate regulations establishing methods, procedures, and equipment to prevent discharges of oil from onshore facilities and contain such discharges when they do occur. This authority was delegated to EPA.  Exec. Order No. 11735, 3 C.F.R., 1971–1975 Comp., p. 793; Exec. Order No. 12777, 3 C.F.R., 1991 Comp., p. 351.

10.     Pursuant to Section 311(j) of the CWA, EPA promulgated Oil Pollution Prevention regulations, also known as the Spill Prevention, Control, and Countermeasure Regulations ("SPCC Regulations").  The SPCC Regulations are codified at 40 C.F.R. Part 112.

11.     The SPCC Regulations apply to owners and operators of non-transportation-related onshore facilities engaged in drilling, producing, gathering, storing, processing, refining, transferring, distributing, using, or consuming oil or oil products with an aboveground storage capacity greater than 1,320 gallons which could reasonably be expected to discharge oil in quantities that may be harmful into or upon the navigable waters of the United States or adjoining shorelines.  40 C.F.R. §§ 112.1(b) and 112.1(d)(2).

12.     A "person" is an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body.  33 U.S.C. § 1362(5).

United States v. North Slope Borough
Case No.

13.     An "owner or operator" is any person owning or operating an onshore facility.  40 C.F.R. § 112.2.

14.     A "facility" is any mobile or fixed, onshore or offshore building, property, parcel, lease, structure, installation, equipment, pipe, or pipeline (other than a vessel or a public vessel) used in oil well drilling operations, oil production, oil refining, oil storage, oil gathering, oil processing, oil transfer, oil distribution, and oil waste treatment.  *Id.*

15.     "Non-transportation-related" facilities include "Oil storage facilities" and "Industrial, commercial, agricultural or public facilities which use and store oil."  *Id.*

16.     An "onshore facility" means any facility of any kind located in, on, or under any land within the United States, other than submerged lands.  *Id.*

17.     "Oil" means oil of any kind or in any form, including petroleum, fuel oil, sludge, synthetic oils, mineral oils, oil refuse, or oil mixed with wastes other than dredged spoil.  *Id.*

18.     "Storage capacity" means the shell capacity of the container.  *Id.*

19.     "Discharge" includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying, or dumping of oil, except in compliance with a permit under Section 402 of the CWA.  *Id.*

20.     "Navigable waters" means waters of the United States, including the territorial seas.  *Id.*  In turn, "waters of the United States" has been defined to include, among other things, waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject

United States v. North Slope Borough
Case No.

5

to the ebb and flow of the tide; tributaries to such waters; and wetlands adjacent to the foregoing waters.  40 C.F.R. § 112.2 (2002).

21.    The SPCC Regulations require owners and operators of regulated facilities to prepare and implement a Spill Prevention, Control and Countermeasure Plan ("SPCC Plan") that adheres to certain requirements detailed in the regulations.  40 C.F.R. § 112.3. Among other things, the SPCC Regulations require:

a.    Preparation of an SPCC Plan in accordance with good engineering practices (40 C.F.R. § 112.7);

b.    Certification of the SPCC Plan by a Professional Engineer (40 C.F.R. § 112.3(d));

c.    Implementation of the SPCC Plan in accordance with the SPCC Regulations (40 C.F.R. § 112.3);

d.    Periodic review and amendment of the SPCC Plan (40 C.F.R. § 112.5);

e.    Construction of adequate secondary containment for bulk storage tank installations (40 C.F.R. § 112.8(c)(2));

f.    Construction of adequate secondary containment for portable containers, including drums with a capacity of 55 gallons or greater (40 C.F.R. § 112.8(c)(11));

g.    Periodic integrity testing and visual inspections of all aboveground containers in accordance with industry standards (40 C.F.R. § 112.8(c)(6)); and

United States v. North Slope Borough
Case No.

h. Retention of testing and inspection documentation (40 C.F.R. § 112.7(e)).

<u>Section 311 Discharge</u>

22. The CWA prohibits the discharge of oil or hazardous substances into or upon the navigable waters of the United States and adjoining shorelines or which may affect natural resources belonging to or appertaining to the United States in such quantities as may be harmful as determined by the President. 33 U.S.C. § 1321(b)(3).

23. Any person who is the owner, operator, or person in charge of any onshore facility from which oil is discharged in violation of Section 311(b) shall be subject to a civil penalty. 33 U.S.C. § 1321(b)(7)(A).

24. An "owner or operator" of an onshore facility means "any person owning or operating such onshore facility." 33 U.S.C. §1321(a).

25. An "onshore facility" is any facility of any kind located in, on, or under, any land within the United States, other than submerged land. *Id.*

26. "Discharge" means any spilling, leaking, pumping, pouring, emitting, emptying or dumping. *Id.*

27. "Oil" means "oil of any kind or in any form." *Id.*

28. "Navigable waters" means waters of the United States, including the territorial seas. 33 U.S.C. § 1362(7). In turn, "waters of the United States" has been defined to include, among other things, waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters

United States v. North Slope Borough
Case No.

7

which are subject to the ebb and flow of the tide; tributaries to such waters; and wetlands adjacent to the foregoing waters. 40 C.F.R. § 110.1 (1993).

29.     The CWA authorizes the President to determine the quantities of oil and hazardous substances that may be harmful to the public health or welfare or the environment of the United States, including but not limited to fish, shellfish, wildlife, and public and private property, shorelines and beaches. 33 U.S.C. § 1321(b)(4). This authority has been delegated to EPA. Exec. Order No. 12777, 3 C.F.R., 1991 Comp., p. 351.

30.     Pursuant to that delegation, EPA promulgated regulations that define quantities of oil that "may be harmful" to include discharges of oil that violate applicable water quality standards or cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines. 40 C.F.R. § 110.3.

<u>Section 301 Discharge</u>

31.     The CWA prohibits the discharge of any pollutant by any person, except, *inter alia*, in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, by EPA or an authorized state. 33 U.S.C. § 1311(a).

32.     "Discharge of a pollutant" means any addition of any pollutant to navigable waters from any point source. 33 U.S.C. § 1362(12).

United States v. North Slope Borough
Case No.

33.     "Pollutant" includes "solid waste . . . chemical wastes, biological materials . . . and industrial . . . waste discharged into water." 33 U.S.C. § 1362(6).

34.     "Navigable waters" means waters of the United States, including the territorial seas. 33 U.S.C. § 1362(7). In turn, "waters of the United States" has been defined to include, among other things, waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide; tributaries to such waters; and wetlands adjacent to the foregoing waters. 40 C.F.R. § 122.2 (1993).

35.     A "point source" is any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. 33 U.S.C. § 1362(14).

<u>Resource Conservation and Recovery Act</u>

36.     RCRA establishes a "cradle-to-grave" program to be administered by the EPA and authorized states for regulating the generation, transportation, treatment, storage, and disposal of hazardous waste. *See* 42 U.S.C. § 6901 *et seq*.

37.     RCRA's Subchapter III, 42 U.S.C. §§ 6921–6939g, also known as "Subtitle C," requires EPA to promulgate regulations establishing performance standards applicable to entities that generate, transport, treat, store, and dispose of hazardous waste. Together, RCRA Subtitle C and its implementing regulations, set forth at 40 C.F.R. Parts 260–279, comprise EPA's RCRA hazardous waste program.

United States v. North Slope Borough
Case No.

9

38.     RCRA regulates both hazardous waste (Subtitle C) and non-hazardous solid waste (Subtitle D).  A hazardous waste is also a solid waste.

39.     A solid waste is any discarded material that is not excluded by regulation, variance, or a non-waste determination.  40 C.F.R. § 261.2(a)(1).

40.     A material is discarded if it is abandoned, recycled, or considered inherently waste like.  40 C.F.R. § 261.2(a)(2)(i).

41.     A material is abandoned if it is, among other things, disposed of, burned or incinerated, or accumulated, stored, or treated (but not recycled) before or in lieu of being disposed of, burned or incinerated.  40 C.F.R. § 261.2(b).

42.     Section 3001 of RCRA, 42 U.S.C. § 6921, directs the EPA to identify criteria to determine which solid wastes should be listed as hazardous wastes and which characteristics of solid waste render it a hazardous waste.  A solid waste is a hazardous waste if it is a listed waste or a characteristic waste.  40 C.F.R. § 261.3(a).

43.     In accordance with 40 C.F.R. Part 261, Subpart C ("Subpart C"), characteristic wastes are so designated because they exhibit one of four characteristics: ignitibility, corrosivity, reactivity, and toxicity.  40 C.F.R. §§ 261.20–261.24.

44.     In accordance with 40 C.F.R. Part 261, Subpart D ("Subpart D"), listed wastes are divided into four categories based on the source of the waste: F-wastes (non-specific sources), K-wastes (specific sources), and P-wastes and U-wastes (discarded chemical products, off-specification species, container residues, and spill residues thereof).  40 C.F.R. §§ 261.30–261.33.

United States v. North Slope Borough
Case No.

45.     Pursuant to its authority under Subtitle C of RCRA, EPA promulgated regulations addressing hazardous waste generators at 40 C.F.R. Part 262; transporters of hazardous waste at 40 C.F.R. Part 263; operators of hazardous waste facilities at 40 C.F.R. Parts 264 and 265; restrictions on land disposal of hazardous waste at 40 C.F.R. Part 268; standards for the management of universal waste at 40 C.F.R. Part 273; and standards for the management of used oil at 40 C.F.R. Part 279.

46.     EPA may authorize a state to administer its own hazardous waste program in lieu of the federal program when it deems the state program to be equivalent to the federal program.  42 U.S.C. § 6926(b).

47.     Alaska has not received authorization to administer its own hazardous waste program so EPA administers the hazardous waste program in Alaska.

Permit Requirement for the Treatment, Storage, or Disposal of Hazardous Waste

48.     RCRA requires each person owning or operating an existing facility or planning to construct a new facility for the treatment, storage, or disposal of hazardous waste to have a permit.  42 U.S.C. § 6925(a).  Owners and operators of hazardous waste management units must have permits during the active life of the unit.  40 C.F.R. § 270.1(b)–(c).

49.     A "person" is an individual, trust, firm, joint stock company, corporation (including a government corporation), partnership, association, State, municipality, commission, political subdivision of a State, or any interstate body and shall include each department, agency, and instrumentality of the United States.  42 U.S.C. § 6903(15).

United States v. North Slope Borough
Case No.

11

50.     An "owner" is the person who owns a facility or part of a facility.  40 C.F.R. § 260.10.

51.     An "operator" is the person responsible for the overall operation of a facility.  *Id*.

52.     "Disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.  *Id*.

53.     "Storage" means the holding of hazardous waste for a temporary period, at the end of which the hazardous waste is treated, disposed of, or stored elsewhere.  *Id*.

54.     "Treatment" means any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste, or so as to recover energy or material resources from the waste, or so as to render such waste non-hazardous, or less hazardous; safer to transport, store, or dispose of; or amenable for recovery, amenable for storage, or reduced in volume.  *Id*.

55.     A "hazardous waste management unit" is a contiguous area of land on or in which hazardous waste is placed, or the largest area in which there is significant likelihood of mixing hazardous waste constituents in the same area.  *Id*.

United States v. North Slope Borough
Case No.

56.     A "facility" is all contiguous land, and structures, other appurtenances, and improvements on the land, used for treating, storing, or disposing of hazardous waste, or for managing hazardous secondary materials prior to reclamation. A facility may consist of several treatment, storage, or disposal operational units (e.g., one or more landfills, surface impoundments, or combinations of them). *Id*.

## Hazardous Waste Determination at the Point of Generation

57.     A person who generates a solid waste must make an accurate hazardous waste determination at the point of generation by determining if the waste is: a) excluded by regulation; b) a listed waste under Subpart D; or c) a characteristic waste under Subpart C. 40 C.F.R. § 262.11.

58.      A "generator" is any person, by site, whose act or process produces a hazardous waste or whose act first causes a hazardous waste to become subject to regulation. 40 C.F.R. § 260.10.

59.     Small or large quantity generators must maintain records supporting their hazardous waste determinations, including records that identify whether a solid waste is a hazardous waste. These records must be maintained for at least three years from the date that the waste was last sent for on-site or off-site treatment, storage, or disposal. 40 C.F.R. § 262.11(f).

## Transporting Hazardous Waste

60.     A transporter must not transport hazardous wastes without having received an EPA identification number. 40 C.F.R. § 263.11(a).

United States v. North Slope Borough
Case No.

13

61.     A "transporter" is a person engaged in the offsite transportation of hazardous waste by air, rail, highway, or water.  40 C.F.R. § 260.10.

<u>Hazardous Waste Manifest Requirements</u>

62.     A generator who transports or offers for transport hazardous waste for offsite treatment, storage, or disposal must prepare a manifest (OMB Control number 2050-0039) on EPA Form 8700-22 and, if necessary, a continuation sheet on EPA Form 8700-22A.  40 C.F.R. § 262.20(a)(1).

63.     At all relevant times, the hazardous waste manifest and any continuation sheet had to be prepared according to instructions contained in an Appendix to 40 C.F.R. Part 262.  40 C.F.R. § 262.20(a)(1) (effective to June 30, 2018).  Recently, the hazardous waste instructions were migrated to EPA's internet domain, www.epa.gov/e-Manifest. *See* 83 Fed. Reg. 420 (Jan. 3, 2018).

64.     A generator must designate on the manifest one facility that is permitted to handle the waste described in the manifest.  40 C.F.R. § 262.20(b).

65.     At all relevant times, the manifest instructions required the generator to:

a.      Enter the name, address, and telephone number of the generator (Item 5);

b.      Identify each hazardous waste listed on the manifest as hazardous waste;

c.      Enter the United States Department of Transportation ("DOT") Proper Shipping Name, Hazard Class or Division, Identification Number (UN/NA), and

United States v. North Slope Borough
Case No.

14

Packing Group for each waste identified in the DOT regulations, 49 C.F.R. Part 172 (Item 9(b));

     d.     Enter the number of containers of each waste and the appropriate abbreviation (Item 10);

     e.     Enter the total quantity of waste being shipped (Item 11);

     f.     Enter up to six federal and state waste codes that describe each waste stream, including the federal waste codes which are most representative of the properties of the waste (Items 13, 31);

     g.     Certify that the "contents of the consignment are fully and accurately described above [in the manifest] by the proper shipping name, and are classified, packaged, marked, and labeled/placarded, and are in all respects in proper condition for transport by highway according to applicable international and national governmental regulations" (Item 15);

     h.     Ensure the generator identified on a manifest continuation sheet matches the generator identified on the manifest (Item 24); and

     i.     For each row, enter a sequential number that corresponds to the order of waste codes from one continuation sheet to the next, to reflect the total number of wastes being shipped (Item 27). 40 C.F.R. Part 262, App.

Exception Reporting

66.     To ensure safe transport and disposal of hazardous waste, the generator of certain quantities of hazardous waste in a calendar month must receive a signed copy of

United States v. North Slope Borough
Case No.

the manifest from the owner or operator of the designated facility the waste has been sent to in order to confirm delivery.

67.     A "designated facility" is a hazardous waste treatment, storage, or disposal facility that is either permitted (or has interim status) under the federal RCRA regulations and that has been designated on the manifest by the generator as the facility that will receive the hazardous waste.  40 C.F.R. § 260.10.

68.     A generator of greater than 100 kilograms but less than 1,000 kilograms of hazardous waste in a calendar month must submit an exception report to the EPA Regional Administrator if it has not received a copy of the manifest signed by the owner or operator of the designated facility within 60 days of the date the waste was accepted by the initial transporter.  40 C.F.R. § 262.42(b).

69.     A generator of 1,000 kilograms or greater of hazardous waste in a calendar month must submit an exception report to the EPA Regional Administrator if it has not received a copy of the manifest signed by the owner or operator of the designated facility within 45 days of the date the waste was accepted by the initial transporter.  40 C.F.R. § 262.42(a)(2).

<u>Land Disposal Restriction Treatment Standards</u>

70.     Under RCRA, certain hazardous wastes are subject to land disposal restrictions ("LDR") and must be treated before they can be land disposed in order to prevent soil and groundwater contamination.

United States v. North Slope Borough
Case No.

16

71.     To ensure safe disposal of a hazardous waste, a generator must determine if the waste must be treated before it can be land disposed.  40 C.F.R. § 268.7(a)(1).

72.     Various listed and characteristic wastes are subject to LDR treatment standards for hazardous wastes.  *See* 40 C.F.R. § 268.40.

73.     If a hazardous waste generator has determined its hazardous waste must be treated before it can be land disposed, or if the generator chooses not make the determination, then the generator must send a one-time written notice with the initial shipment of waste to each treatment or storage facility receiving the waste with certain information about the waste.  40 C.F.R. § 268.7(a)(2).

74.     If the generator chooses not to determine whether its waste must be treated before land disposal, then the notice sent to the treatment facility must include the relevant EPA hazardous waste numbers, the manifest number of the first shipment, and a statement notifying the facility that the "hazardous waste may or may not be subject to LDR treatment standards.  The treatment facility must make the determination."  *Id.*

## Universal Waste Management Standards

75.     Universal waste, while still hazardous waste, is subject to separate management standards due to its common use across industries and facilities in order to encourage recycling and to reduce illegal disposal in municipal landfills and combustors.

76.     Universal waste includes batteries, pesticides, mercury-containing equipment, lamps, and aerosol cans.  40 C.F.R. § 273.1.

United States v. North Slope Borough
Case No.

77.     A "battery" is a device consisting of one or more electrically connected electrochemical cells which is designed to receive, store, and deliver electric energy. An electrochemical cell is a system consisting of an anode, cathode, and an electrolyte, plus such connections (electrical and mechanical) as may be needed to allow the cell to deliver or receive electrical energy. The term battery also includes an intact, unbroken battery from which the electrolyte has been removed. 40 C.F.R. § 273.9.

78.     A used battery becomes a waste on the date it is discarded, and an unused battery becomes a waste on the date the handler decides to discard it. 40 C.F.R. § 273.2(c).

79.     "Lamps," also referred to as "universal waste lamps," are the bulb or tube portion of an electric lighting device. A lamp is specifically designed to produce radiant energy, most often in the ultraviolet, visible, and infra-red regions of the electromagnetic spectrum. Examples of common universal waste electric lamps include, but are not limited to, fluorescent, high intensity discharge, neon, mercury vapor, high pressure sodium, and metal halide lamps. 40 C.F.R. § 273.9.

80.     A lamp is a hazardous waste if it is a characteristic waste under Subpart C. 40 C.F.R. § 273.5(b)(2).

81.     A used lamp becomes a waste on the date it is discarded, and an unused lamp becomes a waste on the date the handler decides to discard it. 40 C.F.R. § 273.5(c).

82.     A "universal waste handler" is a generator of universal waste or the owner or operator of a facility that receives universal waste from other universal waste handlers,

United States v. North Slope Borough
Case No.

18

accumulates universal waste, and sends universal waste to another universal waste handler, to a destination facility, or to a foreign destination. 40 C.F.R. § 273.9.

83.     Different waste management standards apply based on the quantity of universal waste generated or handled.

84.     A "small quantity handler of universal waste" is a universal waste handler who does not accumulate 5,000 kilograms or more of universal waste at any time. *Id.*

85.     A small quantity handler of universal waste must contain any lamp in containers or packages that are structurally sound, adequate to prevent breakage, and compatible with the contents of the lamps. Such containers and packages must remain closed and must lack evidence of leakage, spillage, or damage that could cause leakage under reasonably foreseeable conditions. 40 C.F.R. § 273.13(d)(1).

86.     A small quantity handler of universal waste must immediately clean up and place in a container any lamp that is broken and must place in a container any lamp that shows evidence of breakage, leakage, or damage that could cause the release of mercury or other hazardous constituents to the environment. Such containers must be closed, structurally sound, compatible with the contents of the lamps and must lack evidence of leakage, spillage, or damage that could cause leakage or releases of mercury or other hazardous constituents to the environment under reasonably foreseeable conditions. 40 C.F.R. § 273.13(d)(2).

United States v. North Slope Borough
Case No.

87.     Each lamp or the container or package in which the lamps are contained must be labeled or marked clearly with one of the following phrases: "Universal Waste— Lamp(s)," or "Waste Lamp(s)," or "Used Lamp(s)."  40 C.F.R. § 273.14(e).

88.     Universal waste batteries or a container in which the batteries are contained, must be labeled or marked clearly with any one of the following phrases: "Universal Waste—Battery(ies)," or "Waste Battery(ies)," or "Used Battery(ies)."  40 C.F.R. § 273.14(a).

89.     Subject to certain exceptions, a small quantity handler of universal waste may not accumulate universal waste for longer than one year from the date the waste is generated.  40 C.F.R. § 273.15(a).

90.     A small quantity handler of universal waste must be able to demonstrate the length of time that the universal waste has been accumulated from the date it becomes a waste or is received.  40 C.F.R. § 273.15(c).

<u>Used Oil Management Standards</u>

91.     RCRA requires EPA to establish performance standards to protect public health and the environment from hazards associated with used oil.  42 U.S.C. § 6935. Used oil must be handled in accordance with the management standards promulgated by EPA.  *See* Hazardous Waste Management System; Identification and Listing of Hazardous Waste; Recycled Used Oil Management Standards, 57 Fed. Reg. 41566, (Sept. 10, 1992) (codified at 40 C.F.R. pts. 261, 279).

United States v. North Slope Borough
Case No.

20

92.     A "used oil generator" is any person, by site, whose act or process produces used oil or whose act first causes used oil to become subject to regulation.  40 C.F.R. §§ 279.1 and 279.20(a).

93.     "Used oil" is defined as any oil that has been refined from crude oil, or any synthetic oil, that has been used and as a result of such use is contaminated by physical or chemical impurities.  40 C.F.R. § 279.1.

94.     Containers and aboveground tanks used to store used oil at generator facilities must be labeled or marked clearly with the words "Used Oil."  40 C.F.R. § 279.22(c)(1).

95.     Containers and aboveground tanks used to store used oil at generator facilities must be in good condition (no severe rusting, apparent structural defects or deterioration); and not leaking (no visible leaks).  40 C.F.R. § 279.22(b).

<u>Enforcement Provisions</u>

96.     Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes civil actions for "appropriate relief, including a permanent or temporary injunction" in the case of violation of specified provisions of the CWA, including violations of Section 301 of the CWA, 33 U.S.C. § 1311, and grants jurisdiction to district courts to restrain such violations and to require compliance.

97.     Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), authorizes the United States to commence a civil action in United States District Court to seek appropriate relief in the event of a violation of RCRA and the regulations promulgated thereunder.

United States v. North Slope Borough
Case No.

21

98.    Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A), together with the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, and 40 C.F.R. Part 19.4, provide for civil penalties of up to $37,500 per day of violation or an amount up to $2,100 per barrel discharged in violation of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), for discharges that occurred between December 6, 2013 and November 2, 2015, and civil penalties of up to $48,762 per day of violation or an amount up to $1,951 per barrel for discharges that occurred after November 2, 2015.

99.    Section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C), together with the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, and 40 C.F.R. Part 19.4, provide for civil penalties of up to $37,500 per day of violation of any regulation issued under Section 311(j) of the CWA, 33 U.S.C. § 1321(j) between December 6, 2013 and November 2, 2015, and $48,762 per day of violation occurring after November 2, 2015.

100.    Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), together with the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, and 40 C.F.R. § 19.4, provide that any person who violates RCRA and its implementing regulations shall be subject to a civil penalty of up to $76,764 per day for any violation that occurred after November 2, 2015 and assessed on or after December 23, 2020.  For violations that occurred between

December 6, 2013 and November 2, 2015, EPA may assess a civil penalty of up to $37,500 per day.

101.    EPA conducted three in-person site inspections at three different communities in NSB: a) June 5–7, 2017 in Anaktuvuk Pass; b) June 12–13, 2017 in Utqiagvik; and c) June 14–15, 2017 in Nuiqsut (collectively the "Inspections").

102.    EPA issued five information requests to Defendant under Section 3007(a) of RCRA, 42 U.S.C. § 6927(a); Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9604(e); and Sections 308(a) and 311(m) of the CWA, 33 U.S.C. §§ 1318(a), 1321(m) (collectively the "Requests"). Defendant responded to each of the Requests (collectively the "Responses").

## GENERAL ALLEGATIONS – CWA

### SPCC Violations

103.    Defendant is a municipality and a political subdivision of Alaska as one of its 19 organized boroughs and is therefore a "person" within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

104.    On February 19, 2016, in its Response to the First Request, Defendant provided EPA with copies of an SPCC plan that was finalized in January 2014 ("2014 SPCC Plan").

105.    In the 2014 SPCC Plan, Defendant identified 70 oil storage facilities that are subject to the SPCC Regulations.

United States v. North Slope Borough
Case No.

106. At all relevant times, Defendant was the owner or operator of the facilities.

107. Each of the facilities is a non-transportation-related onshore facility engaged in, among other things, storing, transferring, distributing, using, or consuming oil or oil products.

108. Each of the facilities has an aboveground storage capacity greater than 1,320 gallons.

109. Each of the facilities could reasonably be expected to discharge oil in quantities that may be harmful into or upon the navigable waters of the United States or adjoining shorelines.

110. The 2014 SPCC Plan stated that Defendant shall implement requirements from the SPCC Regulations:

111. The SPCC Regulations further require owners and operators to implement a prepared SPCC Plan.

112. In the 2014 SPCC Plan, Defendant identified numerous tanks and drum storage areas that lacked adequate secondary containment.

113. In the 2014 SPCC Plan, Defendant did not include a schedule or procedures, certified by a professional engineer, for periodic integrity testing and visual inspections of all aboveground containers, including tanks and drum storage areas.

114. Defendant failed to provide evidence that it had corrected the deficiencies in the 2014 SPCC Plan.

United States v. North Slope Borough
Case No.

24

115.    During the Inspections, EPA observed drum storage areas without proper secondary containment in several facilities in Anaktuvak Pass, Utqiagvik, and Nuiqsut.

<u>Point Lay Warm Storage Building Discharge</u>

116.    At all relevant times, the Department of Public Works and Warm Storage Building (hereinafter "Warm Storage Building") in Point Lay, Alaska was owned and operated by Defendant.

117.    Defendant stores oil in 55-gallon drums at this facility.

118.    On September 19, 2014, Defendant identified a leak from drums stored on a gravel pad behind the Warm Storage Building in Point Lay, Alaska.

119.    After discovery of the leak, Defendant's contractor characterized more than 400 drums on the gravel pad and determined that most of the drums contained new or used oil and had been stored at the Warm Storage Building for at least one winter season.

120.    Surface water samples of the wetlands immediately adjacent to the gravel pad exceeded Alaska Water Quality Standards ("AWQS") for total aromatic hydrocarbons and total aqueous hydrocarbons.

121.    A sheen was observed on the surface of the wetlands.

122.    The wetlands are adjacent to the Kasegaluk Lagoon, a tidally-influenced body of water connected to the Chukchi Sea that is navigated by recreational and/or commercial boats.

123.    There is an uninterrupted flow path capable of transporting pollutants from the point of discharge in the wetlands to the Kasegaluk Lagoon.

United States v. North Slope Borough
Case No.

124.    The wetlands, either alone or in combination with similarly situated wetlands in the region, significantly affects the chemical, physical, and/or biological integrity of the Kasegaluk Lagoon.

125.    The Kasegaluk Lagoon is a traditional navigable water.

<u>Kaktovik Utility/School District Warehouse and Heavy Equipment Maintenance Facility Discharge</u>

126.    At all relevant times, the Utility/School District Warehouse ("USDW") and Heavy Equipment Maintenance Facility ("HEMF") in Kaktovik, Alaska was owned and operated by Defendant.

127.    The USDW and HEMF was identified as an SPCC-regulated facility in Defendant's 2014 SPCC Plan.

128.    Defendant stores oil in aboveground storage tanks at the facility, including tank KAK-70.

129.    Tank KAK-70 was a 5,000 gallon tank that contained ultra-low sulfur diesel.  It was staged on a gravel pad and was connected by a fuel line to a pump house for dispensing.

130.    On January 9, 2017, an NSB supervisor discovered a spill from a fuel line that connected the pump house to tank KAK-70.

131.    Approximately 2,400 gallons of oil had spilled from the fuel line.

132.    During routine snow removal activities after the spill and prior to discovery, NSB's heavy equipment operators distributed contaminated snow from the initial spill site into push piles throughout the community.

United States v. North Slope Borough
Case No.

26

133. 14 of the 26 push piles exhibited a sheen upon melting.

134. The area impacted by the spill covered approximately 33,150 square feet.

135. Several of the oil-contaminated push piles were placed onto wetlands surrounding the community.

136. The wetlands are adjacent to the Kaktovik Lagoon and Pipsuk Bight, tidally-influenced bodies of water connected to the Beaufort Sea that are navigated by recreational and/or commercial boats.

137. There is an uninterrupted flow path that is capable of transporting pollutants from the point of discharge in the wetlands to the Kaktovik Lagoon and Pipsuk Bight.

138. The wetlands, either alone or in combination with similarly situated wetlands in the region, significantly affect the chemical, physical, and/or biological integrity of the Kaktovik Lagoon and Pipsuk Bight.

139. The Kaktovik Lagoon and Pipsuk Bight are traditional navigable waters.

## GENERAL ALLEGATIONS – RCRA

140. Defendant is a municipality and a political subdivision of Alaska as one of its 19 organized boroughs and is therefore a "person" within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15) and 40 C.F.R. § 260.10.

### Solid and Hazardous Waste Generation

141. Defendant generated and stored solid and hazardous waste at facilities in Atqasuk, Wainwright, Nuiqsut, Kaktovik, Anaktuvuk Pass, Point Hope, and Utqiagvik.

United States v. North Slope Borough
Case No.

142.   Defendant is a "generator" of hazardous waste within the meaning of 40 C.F.R. § 260.10.

143.   At all relevant times, Defendant generated between 100 and 1,000 kilograms of hazardous waste in a calendar month at the Connex Storage Yard in Point Hope.

144.   At all relevant times, Defendant generated more than 1,000 kilograms of hazardous waste in a calendar month at the USDW Shared Factory in Anaktuvuk Pass.

145.   Defendant stored punctured aerosol cans that constituted hazardous waste at Barrow Shops 1 and 2 in Utqiagvik.

146.   At all relevant times, Defendant generated more than 1,000 kilograms of hazardous waste in a calendar month at Tract J-1-B (including Barrow Shop 3), Tract C (including Barrow Shops 1 and 2), and at South Pad, Block B, Lot 3 in Utqiagvik.

147.   At all relevant times, Defendant generated more than 1,000 kilograms of hazardous waste in a calendar month at the North Slope Public Works Facility in Nuiqsut.

### Hazardous Waste Determinations

148.   Defendant generated solid waste in Atqasuk on or before July 15, 2015 without making hazardous waste determinations before March 1, 2016.

149.    Defendant generated solid waste in Kaktovik on or before August 12, 2015 without making hazardous waste determinations.

United States v. North Slope Borough
Case No.

150.     Defendant generated solid waste in Wainwright on or before July 8, 2015 without making hazardous waste determinations prior to March 1, 2016.

151.     Defendant generated solid waste in Anaktuvuk Pass on or before October 22, 2015 without making hazardous waste determinations prior to March 1, 2016.

152.     During the Inspections, EPA observed solid waste throughout Anaktuvuk Pass generated before June 5, 2017.  No records of hazardous waste determinations have been produced.

153.     Defendant generated solid waste at Tract C in Utqiagvik prior to May 1, 2016 without making hazardous waste determinations prior to December 1, 2016.

154.     Defendant generated solid waste at Tract J-1-B in Utqiagvik prior to March 1, 2016 without making hazardous waste determinations prior to June 7, 2017.

155.     During the Inspections, EPA observed solid waste in Utqiagvik generated before June 12, 2017.  No records of hazardous waste determinations have been produced.

156.     Defendant generated solid waste in Nuiqsut prior to July 22, 2015 without making hazardous waste determinations prior to March 1, 2016.

157.     During the Inspections, EPA observed solid waste in Nuiqsut generated before June 14, 2017.  No records of hazardous waste determinations have been produced.

158.     Defendant generated solid waste in Point Hope prior to April 24, 2015 without making hazardous waste determinations prior to May 1, 2015.

United States v. North Slope Borough
Case No.

159.    Defendant generated solid waste in Point Hope prior to August 1, 2017 without making hazardous waste determinations.

## Transporting Hazardous Waste

160.    At all relevant times, Defendant was a "transporter" of hazardous waste within the meaning of 40 C.F.R. § 260.10.

161.    Defendant transported at least 32 drums of hazardous waste between Tract C and Tract J-1-B in Utqiagvik before May 2016.

162.    No hazardous waste manifest was prepared for the transport.

163.    Tract C is not contiguous with Tract J-1-B, and the 32 drums of hazardous waste traveled over public roadways from Tract C to Tract J-1-B.

## Solid and Hazardous Waste Manifests

164.    Between May 25, 2017 and June 1, 2017, Defendant offered hazardous waste for shipment from Anaktuvuk Pass to an offsite facility operated by Chemical Waste Management of the Northwest, Inc., in Arlington, Oregon ("CWM") for disposal.

165.    On December 19, 2016 and July 21, 2017, Defendant offered hazardous waste for shipment from Utqiagvik to CWM for disposal.

166.    On September 3, 2015, Defendant offered hazardous waste for shipment from Point Hope to CWM for disposal.

167.    CWM is a "designated facility" as that term is defined at 40 C.F.R. § 260.10.

United States v. North Slope Borough
Case No.

168.    CWM documented errors in the Anaktuvuk Pass, Utqiagvik, and Point Hope hazardous waste manifests.

Used Oil and Universal Waste

169.    Defendant is a "used oil generator" within the meaning of 40 C.F.R. § 279.1.

170.    At all relevant times, Defendant stored used oil in containers and/or aboveground tanks at its facilities in Anaktuvuk Pass, Utqiagvik, and Nuiqsut.

171.    At all relevant times, Defendant was a "universal waste handler" and a "small quantity handler of universal waste" as those terms are defined at 40 C.F.R. § 273.9.

172.    Defendant stored discarded waste lamps in Anaktuvuk Pass and Utqiagvik.

173.    The discarded waste lamps constitute hazardous waste due to their mercury content and are therefore "lamps" or "universal waste lamps" within the meaning of 40 C.F.R. § 273.5.

174.    Defendant stored discarded lead-acid batteries in Anaktuvuk Pass.

175.    The discarded lead-acid batteries constitute hazardous waste due to their sulfuric acid and lead content, and are therefore "batteries" within the meaning of 40 C.F.R. § 273.2.

United States v. North Slope Borough
Case No.

## FIRST CLAIM FOR RELIEF—CWA
(Failure to Comply with the SPCC Regulations in Violation of
40 C.F.R. Part 112)

176. The allegations in Paragraphs 1 through 175 are re-alleged and incorporated herein by reference.

177. Each of Defendant's SPCC facilities is a "non-transportation related" "onshore facility" that is engaged in, among other things, storing, transferring, distributing, using, or consuming "oil" or oil products, and has an aboveground storage capacity greater than 1,320 gallons in containers each with a shell capacity of at least 55 gallons.

178. A discharge of oil from each of the facilities could reasonably be expected to discharge oil in quantities that may be harmful into or upon the navigable waters of the United States or adjoining shorelines within the meaning of 40 C.F.R. § 112.1(b).

179. Defendant is the owner and/or operator of each of the facilities.

180. Defendant is required to create, maintain and implement an SPCC Plan for each of the facilities and comply with applicable requirements set forth in the SPCC Regulations.

181. On information and belief, Defendant failed to comply with provisions of the SPCC Regulations, including the following:

    a.    Defendant failed to have its procedures for required inspections and testing certified by a Professional Engineer in violation of 40 C.F.R. § 112.3(d);

United States v. North Slope Borough
Case No.

b.      Defendant failed to construct adequate secondary containment for all its bulk storage tank installations and mobile oil storage containers in violation of 40 C.F.R. § 112.8(c)(2) and (11); and

c.      Defendant failed to conduct periodic integrity testing and visual inspections of all aboveground containers and retain documentation related thereto in violation of 40 C.F.R. § 112.7(e) and 112.8(c)(6).

182.    Each failure described in the preceding Paragraph constitutes a violation of the SPCC Regulations, 40 C.F.R. Part 112.

183.    For each violation referenced in this Claim, Defendant is liable for civil penalties as set forth in Paragraph 99.

## SECOND CLAIM FOR RELIEF—CWA
(Discharge of Oil into Navigable Waters in Harmful Quantities in Violation of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3))

184.    The allegations in Paragraphs 1 through 175 are re-alleged and incorporated herein by reference.

185.    The Warm Storage Building at Point Lay is an "onshore facility" within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. §1321(a)(10).

186.    The USDW and HEMF at Kaktovik is an "onshore facility" within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. §1321(a)(10).

187.    Defendant is an owner or operator of the Warm Storage Building and the USDW and HEMF within the meaning of Section 311(a)(6) of the CWA, 33 U.S.C. § 1321(a)(6).

United States v. North Slope Borough
Case No.

33

188.     At least on September 19, 2014, Defendant discharged oil from the Warm Storage Building into or upon wetlands adjacent to the Kasegaluk Lagoon.

189.     On January 9, 2017, Defendant discharged oil from the USDW and HEMF into or upon wetlands adjacent to the Kaktovik Lagoon and Pipsuk Bight.

190.     Defendant's discharges to the Kasegaluk Lagoon, the Kaktovik Lagoon and Pipsuk Bight each constituted a discharge of oil into or upon navigable waters within the meaning of Sections 311(a)(2) and (b)(3) of the CWA, 33 U.S.C. §§ 1321(a)(2) and (b)(3).

191.     The wetlands adjacent to the Kasegaluk Lagoon, the Kaktovik Lagoon, and Pipsuk Bight are waters of the United States within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3) and 1362(7).

192.     Each of the discharges referred to above resulted in the presence of oil in waters of the United States in sufficient quantities to cause a sheen, sludge, emulsion or violation of water quality standards.

193.     Each of the discharges of oil referred to above was in a quantity that may be harmful, within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3) and 40 C.F.R. § 110.3.

194.     Therefore, Defendant violated Section 311(b)(3) of the CWA by discharging oil into navigable waters in harmful quantities on at least two occasions.

195.     For each violation referenced in this Claim, Defendant is liable for civil penalties as set forth in Paragraph 98.

United States v. North Slope Borough
Case No.

34

<u>**THIRD CLAIM FOR RELIEF—CWA**</u>

(Discharge of Pollutant without a Permit in Violation of
Section 301(a) of the CWA, 33 U.S.C. § 1311(a))

196.    The allegations in Paragraphs 1 through 175 are re-alleged and incorporated herein by reference.

197.    The oil in the drums located in the drum storage area behind the Warm Storage Building in Point Lay, Alaska is a "pollutant" within the meaning of Sections 301(a) and 502(6) of the CWA, 33 U.S.C. §§ 1311(a) and 1362(6).

198.    The oil in tank KAK-70 in Kaktovik, Alaska is a "pollutant" within the meaning of Sections 301(a) and 502(6) of the CWA, 33 U.S.C. §§ 1311(a) and 1362(6).

199.    The drums located in the drum storage area behind the Warm Storage Building that added oil to wetlands adjacent to the Kasegaluk Lagoon are "point source[s]" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

200.    The heavy equipment used to push oil-contaminated snow to wetlands adjacent to the Kaktovik Lagoon and Pipsuk Bight is a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

201.    The wetlands adjacent to the Kasegaluk Lagoon, Kaktovik Lagoon, and Pipsuk Bight are waters of the United States within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

202.    At least on September 19, 2014, Defendant discharged oil from the drums located in the drum storage area behind the Warm Storage Building in Point Lay, Alaska to wetlands adjacent to the Kasegaluk Lagoon.

United States v. North Slope Borough
Case No.

35

203.    On January 9, 2017, Defendant discharged oil from tank KAK-70 to wetlands adjacent to the Kaktovik Lagoon and Pipsuk Bight.

204.    Defendant's actions constitute a "discharge of pollutants" within the meaning of Sections 301(a) and 502(12) of the CWA, 33 U.S.C. §§ 1311(a) and 1362(12).

205.    Each of the discharges referred to above was not authorized by a permit issued by EPA or the State of Alaska pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

206.    Therefore, Defendant violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a), by adding pollutants to navigable waters from a point source without a permit on at least two occasions.

207.    For each violation referenced in this Claim, Defendant is liable for injunctive relief as set forth in Paragraph 96.

## FOURTH CLAIM FOR RELIEF—RCRA
### (Treatment, Storage, and Disposal of Hazardous Waste without a Permit or Interim Status in Violation of Section 3005 of RCRA, 42 U.S.C. § 6925, and 40 C.F.R. § 270.1(b)–(c))

208.    The allegations in Paragraphs 1 through 175 are re-alleged and incorporated herein by reference.

209.    RCRA prohibits the owners and operators of a facility from treating, storing, and disposing of hazardous waste without a permit or interim status.

210.    Defendant stored more than 48,000 pounds of hazardous waste at a contiguous facility in Anaktuvuk Pass between September 1, 2016 and May 25, 2017.

United States v. North Slope Borough
Case No.

36

211. Defendant stored more than 26,700 pounds of hazardous waste at Tract J-1-B in Utqiagvik between March 1, 2016 and July 21, 2017.

212. Defendant stored 125 drums of hazardous waste at Tract J-1-B in Utqiagvik between May 1, 2016 and December 19, 2016.

213. Defendant stored at least 8,445 pounds of hazardous waste at the Connex Storage Yard in Point Hope between at least December 1, 2012 and September 2015.

214. Defendant has stored at least 18 drums of hazardous waste at and around the NSB Public Works Facility in Nuiqsut since at least March 1, 2016.

215. Prior to June 12, 2017, Defendant treated hazardous waste aerosol cans at Barrow Shops 1 and 2 in Utqiagvik.

216. At all relevant times, Defendant owned and/or operated the facilities listed above.

217. At all relevant times, Defendant had neither a permit nor interim status authorizing the treatment, storage, or disposal of hazardous waste at the facilities listed above.

218. Each day that Defendant stored or treated hazardous waste without permit or interim status constitutes a violation of Section 3005 of RCRA, 42 U.S.C. § 6925, and 40 C.F.R. § 270.1(b)–(c).

219. For each violation referenced in this Claim, Defendant is liable for injunctive relief and civil penalties as set forth in Paragraphs 97 and 100.

Case 3:22-cv-00059-JWS   Document 1   Filed 03/16/22   Page 37 of 53

## FIFTH CLAIM FOR RELIEF—RCRA
### (Failure to Make a Hazardous Waste Determination at the Point of Generation in Violation of 40 C.F.R. § 262.11)

220.    The allegations in Paragraphs 1 through 175 are re-alleged and incorporated herein by reference.

221.    Defendant, as a generator of solid waste, was required to make a hazardous waste determination at the point of waste generation.

222.    Defendant generated at least 281 drums of solid waste in Atqasuk prior to July 15, 2015 without making hazardous waste determinations at the point of waste generation.

223.    Defendant generated at least 300 drums and 75 containers of solid waste in Kaktovik prior to August 12, 2015 without making hazardous waste determinations at the point of waste generation.

224.    Defendant generated at least 205 containers of solid waste in Wainwright prior to July 8, 2015 without making hazardous waste determinations at the point of waste generation.

225.    Defendant generated at least 457 drums of solid waste in Anaktuvuk Pass prior to October 22, 2015 without making hazardous waste determinations at the point of waste generation.

226.    Defendant generated at least 80 drums of solid waste in Anaktuvuk Pass on or before June 5, 2017 without making hazardous waste determinations at the point of waste generation.

United States v. North Slope Borough
Case No.

227.    Defendant generated at least 650 containers of solid waste in Utqiagvik prior to March 1, 2016 without making hazardous waste determinations at the point of waste generation.

228.    Defendant generated at least 147 drums of solid waste in Utqiagvik prior to May 1, 2016 without making hazardous waste determinations at the point of waste generation.

229.    Defendant generated at least 20 containers of solid waste in Utqiagvik prior to June 12, 2017 without making hazardous waste determinations at the point of waste generation.

230.    Defendant generated at least 17 drums of solid waste in Utqiagvik prior to June 12, 2017 without making hazardous waste determinations at the point of waste generation.

231.    Defendant generated at least 377 containers of solid waste in Nuiqsut prior to July 22, 2015 without making hazardous waste determinations at the point of waste generation.

232.    Defendant generated at least 82 drums and containers of solid waste, 128 solid waste aerosol cans, and 28 waste propane cylinders in Nuiqsut prior to June 14, 2017 without making hazardous waste determinations at the point of waste generation.

233.    Defendant generated at least 153 containers of solid waste in Point Hope prior to April 24, 2015 without making hazardous waste determinations at the point of waste generation.

United States v. North Slope Borough
Case No.

234. Defendant generated at least 120 containers of solid waste in Point Hope prior to August 1, 2017 without making hazardous waste determinations at the point of waste generation.

235. Each failure to make a hazardous waste determination at the point of waste generation constitutes a violation of 40 C.F.R. § 262.11.

236. For each violation referenced in this Claim, Defendant is liable for injunctive relief and civil penalties as set forth in Paragraphs 97 and 100.

**SIXTH CLAIM FOR RELIEF—RCRA**
(Transporting Hazardous Waste without an EPA Identification Number in Violation of
40 C.F.R. § 263.11(a))

237. The allegations in Paragraphs 1 through 175 are re-alleged and incorporated herein by reference.

238. Defendant, as a transporter of hazardous waste, was required to secure an identification number from EPA prior to transport.

239. Between April 28, 2016 and May 31, 2016, Defendant transported at least 32 drums of hazardous waste from Tract C (including Barrow Shops 1 and 2) to Tract J-1-B (including Barrow Shop 3) in Utqiagvik without an EPA identification number.

240. Each failure to obtain an EPA identification number when transporting hazardous waste constitutes a violation of 40 C.F.R. § 263.11(a).

241. For each violation referenced in this Claim, Defendant is liable for injunctive relief and civil penalties as set forth in Paragraphs 97 and 100.

United States v. North Slope Borough
Case No.

## SEVENTH CLAIM FOR RELIEF—RCRA

(Shipping Hazardous Waste without a Hazardous Waste Manifest in Violation of
40 C.F.R. § 262.20(a)(1))

242.    The allegations in Paragraphs 1 through 175 are realleged and incorporated herein by reference.

243.    At all relevant times, Defendant, as a generator of hazardous waste, was required to prepare a hazardous waste manifest when offering for transport a hazardous waste for offsite disposal.

244.    On June 1, 2017, Defendant shipped two drums of hazardous waste from Anaktuvuk Pass to CWM without a hazardous waste manifest.

245.    On May 25, 2017, Defendant shipped two containers of hazardous waste from Anaktuvuk Pass to CWM without a hazardous waste manifest.

246.    On December 19, 2016, Defendant shipped two containers of hazardous waste from Utqiagvik to CWM without a hazardous waste manifest.

247.    On December 19, 2016, Defendant shipped two containers of hazardous waste from Utqiagvik to CWM without a hazardous waste manifest.

248.    On September 3, 2015, Defendant shipped one container of hazardous waste from Point Hope to CWM without a hazardous waste manifest.

249.    Each failure to prepare a hazardous waste manifest when shipping hazardous waste constitutes a violation of 40 C.F.R. § 262.20(a)(1).

250.    For each violation referenced in this Claim, Defendant is liable for injunctive relief and civil penalties as set forth in Paragraphs 97 and 100.

United States v. North Slope Borough
Case No.

41

## EIGHTH CLAIM FOR RELIEF—RCRA

### (Improperly Manifesting Hazardous Waste Shipments in Violation of 40 C.F.R. § 262.20(a)(1))

251.    The allegations in Paragraphs 1 through 175 are re-alleged and incorporated herein by reference.

252.    At all times relevant to this Claim, Defendant, as a generator of hazardous waste, was required to prepare a Uniform Hazardous Waste Manifest in accordance with the instructions in the Appendix to 40 C.F.R. § 262.20(a)(1).

253.    Manifest 016203763JJK documenting the shipment of hazardous waste from Anaktuvuk Pass to CWM for offsite disposal mischaracterized hazardous waste as non-hazardous waste, omitted a waste code, and was improperly certified.

254.    Manifest 016930954JJK documenting the shipment of hazardous waste from Anaktuvuk Pass to CWM for off-site disposal omitted four waste codes.

255.    Manifest 016203762JJK documenting the shipment of hazardous waste from Anaktuvuk Pass to CWM for off-site disposal omitted a waste code and was improperly certified.

256.    Manifest 011872826JJK documenting the shipment of hazardous waste from Utqiagvik to CWM for off-site disposal listed different generator names on the manifest and its continuation sheet, mischaracterized hazardous waste as non-hazardous waste, and omitted two waste codes.

257.    Manifest 011872827JJK documenting the shipment of hazardous waste from Utqiagvik to CWM for off-site disposal listed different generator names on the

United States v. North Slope Borough
Case No.

42

manifest and its continuation sheet, mischaracterized two drums of hazardous waste as non-hazardous, and omitted three waste codes.

258. Manifest 011872830JJK documenting the shipment of hazardous waste from Utqiagvik to CWM for off-site disposal listed different generator names on the manifest and its continuation sheet.

259. Manifest 011872819JJK documenting the shipment of hazardous waste from Utqiagvik to CWM for off-site disposal mischaracterized one drum of hazardous waste as non-hazardous waste and omitted a waste code.

260. Manifest 011872820JJK documenting the shipment of hazardous waste from Utqiagvik to CWM for off-site disposal mischaracterized 8 containers of hazardous waste as non-hazardous waste and omitted at least four waste codes.

261. Manifest 011872821JJK documenting the shipment of hazardous waste from Utqiagvik to CWM for off-site disposal: mischaracterized 6 drums of hazardous waste as non-hazardous, omitted four waste codes; and underreported the quantity of hazardous waste diesel.

262. Manifest 016212736JJK documenting the shipment of hazardous waste from Utqiagvik to CWM for off-site disposal mischaracterized five containers of hazardous waste as non-hazardous waste and omitted a waste code.

263. Manifest 013472795JJK documenting the shipment of hazardous waste from Point Hope to CWM for off-site disposal mischaracterized one container of hazardous waste as non-hazardous waste, and omitted a waste code.

United States v. North Slope Borough
Case No.

43

264.    Each failure to prepare a complete and accurate manifest accompanying the above-described hazardous waste shipments constitutes a violation of 40 C.F.R. § 262.20(a)(1).

265.    For each violation referenced in this Claim, Defendant is liable for injunctive relief and civil penalties as set forth in Paragraphs 97 and 100.

## NINTH CLAIM FOR RELIEF—RCRA
(Failure to Submit an Exception Report in Violation of 40 C.F.R. § 262.42(a), (b))

266.    The allegations in Paragraphs 1 through 175 are realleged and incorporated herein by reference.

267.    At all relevant times, Defendant, as a generator of greater than 100 kilograms but less than 1,000 kilograms of hazardous waste in a calendar month in Point Hope, was required to submit an exception report to EPA if it did not receive a signed copy of the manifest from the designated facility within 60 days after the waste was accepted by the initial transporter.

268.    At all relevant times, Defendant, as a generator of 1,000 kilograms or greater of hazardous waste in a calendar month in Anaktuvuk Pass and Utqiagvik, was required to submit an exception report to EPA if it did not receive a signed copy of the manifest from the designated facility within 45 days after the waste was accepted by the initial transporter.

269.    Defendant did not submit an exception report to EPA for hazardous waste documented on Manifest 016930951JJK even though 54 days elapsed between acceptance of the waste by the initial transporter and receipt by CWM.

United States v. North Slope Borough
Case No.

44

270. Defendant did not submit an exception report to EPA for hazardous waste documented on Manifest 016203762JJK even though 56 days elapsed between acceptance of the waste by the initial transporter and receipt by CWM.

271. Defendant did not submit an exception report to EPA for hazardous waste documented on Manifest 016203763JJK even though 54 days elapsed between acceptance of the waste by the initial transporter and receipt by CWM.

272. Defendant did not submit an exception report to EPA for hazardous waste documented on Manifest 011872826JJK even though 52 days elapsed between acceptance of the waste by the initial transporter and receipt by CWM.

273. Defendant did not submit an exception report to EPA for hazardous waste documented on Manifest 011872827JJK even though 50 days elapsed between acceptance of the waste by the initial transporter and receipt by CWM.

274. Defendant did not submit an exception report to EPA for hazardous waste documented on Manifest 011872835JJK even though 84 days elapsed between acceptance of the waste by the initial transporter and receipt by CWM.

275. Defendant did not submit an exception report to EPA for hazardous waste documented on Manifest 013472789JJK even though 74 days elapsed between acceptance of the waste by the initial transporter and receipt by CWM.

276. Defendant did not submit an exception report to EPA for hazardous waste documented on Manifest 013472792JJK even though 74 days elapsed between acceptance of the waste by the initial transporter and receipt by CWM.

United States v. North Slope Borough
Case No.

277. Defendant did not submit an exception report to EPA for hazardous waste documented on Manifest 013472793JJK even though 74 days elapsed between acceptance of the waste by the initial transporter and receipt by CWM.

278. Defendant did not submit an exception report to EPA for hazardous waste documented on Manifest 013472795JJK even though 74 days elapsed between acceptance of the waste by the initial transporter and receipt by CWM.

279. Each failure to submit the required exception reports to EPA constitutes a violation of 40 C.F.R. § 262.42(a) and (b).

280. For each violation referenced in this Claim, Defendant is liable for injunctive relief and civil penalties as set forth in Paragraphs 97 and 100.

## TENTH CLAIM FOR RELIEF—RCRA
### (Failure to Provide an LDR Notice in Violation of 40 C.F.R. § 268.7(a)(2))

281. The allegations in Paragraphs 1 through 175 are realleged and incorporated herein by reference.

282. Defendant, as a generator of hazardous waste, was required to send an LDR notice with any initial hazardous waste shipment when treatment standards for land disposal were not met or were not determined in advance.

283. Defendant sent initial shipments of hazardous waste from Anaktuvuk Pass to CWM, as documented on Manifests 016203759JJK, 016930954JJK, 016930951JJK, 016203762JJK, and 016203763JJK without an LDR notice or a land disposal determination.

United States v. North Slope Borough
Case No.

284.    Defendant sent an initial shipment of hazardous waste from Point Hope to CWM, as documented on Manifest 013472795JJK, without an LDR notice or a land disposal determination.

285.    Each failure to include an LDR notice with an initial shipment of hazardous waste when treatment standards for land disposal were not met or not determined in advance constitutes a violation of 40 C.F.R. § 268.7(a)(2).

286.    For each violation referenced in this Claim, Defendant is liable for injunctive relief and civil penalties as set forth in Paragraphs 97 and 100.

## ELEVENTH CLAIM FOR RELIEF—RCRA
(Failure to Properly Label Used Oil Containers in Violation of 40 C.F.R. § 279.22(c))

287.    The allegations in Paragraphs 1 through 175 are realleged and incorporated herein by reference.

288.    Defendant, as a used oil generator, was required to ensure that all containers and aboveground tanks used to store used oil at its facilities were labeled or marked clearly with the words "Used Oil."

289.    Between at least June 5–7, 2017, Defendant stored 121 containers and two aboveground tanks of used oil in Anaktuvuk Pass that were not labeled or marked clearly with the words "Used Oil."

290.    Between at least June 12–13, 2017, Defendant stored four containers, one spill pallet, two 250-gallon tanks, and a 55-gallon drum of used oil in Utqiagvik that were not labeled or marked clearly with the words "Used Oil."

United States v. North Slope Borough
Case No.

47

291.    Between at least June 14–15, 2017, Defendant stored one 55-gallon container of used oil at the O&M Shop and one 150-gallon tank in Nuiqsut that was not labeled or marked clearly with the words "Used Oil."

292.    Each failure to label or clearly mark used oil containers and aboveground tanks constitutes a violation of 40 C.F.R. § 279.22(c).

293.    For each violation referenced in this Claim, Defendant is liable for injunctive relief and civil penalties as set forth in Paragraphs 97 and 100.

**TWELFTH CLAIM FOR RELIEF—RCRA**
(Failure to Properly Contain Universal Waste Lamps in Violation of
40 C.F.R. § 273.13(d)(1))

294.    The allegations in Paragraphs 1 through 175 are realleged and incorporated herein by reference.

295.    Defendant, as a small quantity handler of universal waste lamps, was required to store its universal waste lamps in containers or packages that were structurally sound, adequate to prevent breakage, compatible with the contents of the lamps, and closed.

296.    Between at least June 5–7, 2017, Defendant stored at least 225 discarded universal waste lamps in Anaktuvuk Pass without any containment or packaging.

297.    Between at least June 5–7, 2017, Defendant stored several discarded universal waste lamps in Anaktuvuk Pass in at least five containers that did not remain closed.

298.    Between at least June 12–13, 2017, Defendant stored at least eight discarded universal waste lamps in Utqiagvik in a container that was not adequate to prevent breakage and was not closed.

299.    Each failure to properly contain universal waste lamps constitutes a violation of 40 C.F.R. § 273.13(d)(1).

300.    For each violation referenced in this Claim, Defendant is liable for injunctive relief and civil penalties as set forth in Paragraphs 97 and 100.

### THIRTEENTH CLAIM FOR RELIEF—RCRA
(Failure to Immediately Clean Up and Store Broken Universal Waste Lamps in Violation of 40 C.F.R. § 273.13(d)(2))

301.     The allegations in Paragraphs 1 through 175 are realleged and incorporated herein by reference.

302.    Defendant, as a small quantity generator of universal waste lamps, was required to immediately clean up and place in a container any broken universal waste lamps.

303.    Between at least June 5–7, 2017, Defendant failed to immediately clean up and place in a container at least one discarded universal waste lamp that was broken in Anaktuvuk Pass.

304.    Each failure to immediately clean up and store broken universal waste lamps constitutes a violation of 40 C.F.R. § 273.13(d)(2).

305.    For each violation referenced in this claim, Defendant is liable for injunctive relief and civil penalties as set forth in Paragraphs 97 and 100.

United States v. North Slope Borough
Case No.

49

## FOURTEENTH CLAIM FOR RELIEF—RCRA

### (Failure to Properly Label or Mark Universal Waste in Violation of
### 40 C.F.R. § 273.14(a), (e))

306. The allegations in Paragraphs 1 through 175 are realleged and incorporated herein by reference.

307. Defendant, as a small quantity handler of universal waste lamps, was required to mark each universal waste lamp or its container or packaging with any of the following labels: "Universal Waste—Lamp(s)," or "Waste Lamp(s)," or "Used Lamp(s)."

308. Defendant, as a small quantity generator of universal waste, was required to clearly label universal waste batteries or their containers with any of the following phrases: "Universal Waste—Battery(ies)," or "Waste Battery(ies)," or "Used Battery(ies)."

309. Between at least June 5–7, 2017, Defendant stored at least 366 universal waste lamps in Anaktuvuk Pass without properly labeling or marking the universal waste lamps or the packaging or containers holding the lamps.

310. Between at least June 5–7, 2017, Defendant stored at least 15 lead acid batteries in Anaktuvuk Pass without properly labeling or marking the individual batteries or the container holding the batteries.

311. Between at least June 12–13, 2017, Defendant stored at least 126 universal waste lamps in Utqiagvik without properly labeling or marking the universal waste lamps or the packaging or containers holding the lamps.

United States v. North Slope Borough
Case No.

312. Each failure to properly label or mark universal waste or its container or packaging constitutes a violation of 40 C.F.R. § 273.14(a), (e).

313. For each violation referenced in this Claim, Defendant is liable for injunctive relief and civil penalties as set forth in Paragraphs 97 and 100.

## FIFTEENTH CLAIM FOR RELIEF—RCRA
(Accumulating Universal Waste for Longer than One Year in Violation of
40 C.F.R. § 273.15(a))

314. The allegations in Paragraphs 1 through 175 are realleged and incorporated herein by reference.

315. Defendant, as a small quantity generator of universal waste, was prohibited from accumulating universal waste for longer than a year from the date it was generated or received from another handler.

316. Defendant stored at least 361 universal waste lamps in Anaktuvuk Pass for longer than a year.

317. Each instance of accumulating universal waste for longer than one year constitutes a violation of 40 C.F.R. § 273.15(a).

318. For each violation referenced in this Claim, Defendant is liable for injunctive relief and civil penalties as set forth in Paragraphs 97 and 100.

## SIXTEENTH CLAIM FOR RELIEF—RCRA
(Failure to Demonstrate the Accumulation Time of Universal Waste in
Violation of 40 C.F.R. § 273.15(c))

319. The allegations in Paragraphs 1 through 175 are re-alleged and incorporated herein by reference.

United States v. North Slope Borough
Case No.

320. Defendant, as a small quantity generator of universal waste, was required to demonstrate the length of time universal waste had been accumulated from the date it becomes a waste or was received.

321. Between at least June 5–7, 2017, Defendant was unable to demonstrate the length of accumulation time of at least 366 universal waste lamps and at least 15 lead acid batteries stored in Anaktuvuk Pass.

322. Each failure to demonstrate the accumulation time of universal waste constitutes a violation of 40 C.F.R. § 273.15(c).

323. For each violation referenced in this claim, Defendant is liable for injunctive relief and civil penalties as set forth in Paragraphs 97 and 100.

## RELIEF REQUESTED

WHEREFORE, Plaintiff, the United States of America, respectfully requests that the Court grant the following relief:

1. Order Defendant to immediately comply with the statutory and regulatory requirements cited in this Complaint;

2. Assess a civil penalty against Defendant up to the maximum amounts provided for under the CWA and RCRA for each violation thereof;

3. Order Defendant to take all appropriate action to prevent spills from its facilities into waters of the United States, in compliance with the CWA and the SPCC Regulations; and

4. Grant such other relief as this Court may deem just and proper.

United States v. North Slope Borough
Case No.

52

Dated: March 16, 2022

Respectfully Submitted,

FOR THE UNITED STATES

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

ZACHARY N. MOOR (MA Bar No. 681469)
HELEN Y. LI (CT Bar No. 439117)
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 514-4185
Email: zachary.moor@usdoj.gov

OF COUNSEL:

BRETT S. DUGAN
U.S. Environmental Protection
Agency Region 10
1200 Sixth Avenue, Suite 155
Seattle, WA 98101

JOHN M. MOORE
U.S. Environmental Protection
Agency Region 10
1200 Sixth Avenue, Suite 155
Seattle, WA 98101

United States v. North Slope Borough
Case No.